<u>**NOT FOR PUBLICATION**</u>

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| **JUAN MORALES**, | |
| Plaintiff, | Civil Action No. 21-07263 (ZNQ) (RLS) |
| v. | **OPINION** |
| **TRAVIS MAXWELL**, *et al.*, | |
| Defendants. | |

<u>**QURAISHI, District Judge**</u>

**THIS MATTER** comes before the Court upon a Motion for Summary Judgment ("Motion", ECF No. 85) filed by Defendants Officer Travis Maxwell ("Officer Maxwell") and Officer Frederick Bender ("Officer Bender") (together, "Defendants" or "Defendant Officers").[1] In support of the Motion, Defendants filed a Moving Brief. ("Moving Br.", ECF No. 85-2.) Plaintiff opposed ("Opp'n", ECF No. 87) and Defendants replied ("Reply", ECF No. 86.) After careful consideration of the parties' submissions, the Court decides the Motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, the Court will **GRANT** Defendants' Motion.

---

[1] Plaintiff replaced a prior defendant, Officer Hutton, with Officer Bender in the Amended Complaint as the officer who knocked Plaintiff to the ground (*see* Am. Compl. ¶ 38). He also omitted the City of Trenton. Defendants, in an apparent abundance of caution, included Officer Hutton and the City of Trenton among the movants for summary judgment. However, because neither Officer Hutton nor Trenton are named in the Amended Complaint, the Court deems those claims withdrawn. *See also* ECF No. 35 at 4–5, Opinion issued April 26, 2022 (observing that the only defendants named in the Amended Complaint are Officers Bender and Maxwell).

I.    **BACKGROUND AND PROCEDURAL HISTORY**

A.    **FACTUAL BACKGROUND/UNDISPUTED FACTS**

On April 18, 2019, at approximately 10:30 P.M., the Defendant Officers, along with Officer Eliezer Ramos ("Officer Ramos"), were patrolling the area of Pearl and Hudson Street in Trenton, New Jersey in their capacities as part of the Trenton Police Department ("TPD") Violent Crimes Unit.  (Defendants' Statement of Undisputed Material Facts, "Ds' SUMF", ECF No. 85-1 ¶ 1; "P's Additional SUMF", ECF No. 87-2 ¶ 1; Maxwell Incident Report ("Maxwell Rep."), ECF Nos. 85-4 Ex. B & 87-5 Ex. 3 at 13; "Maxwell Dep.", ECF No. 88-2 Ex. 7 at 9:16-23.)[2]  The area is known to the TPD and understood by Plaintiff to be a high-volume violent crime area where weapons and narcotics violations occur, as do violations of City Ordinances.  (Ds' SUMF ¶ 2; "P's Response to Ds' SUMF", ECF No. 87-1 ¶¶ 2, 40; "Morales Dep.", ECF Nos. 85-7 Ex. F & 87-7 Ex. 5 at 40:15-24.)  While traveling down Pearl Street from Benton Avenue towards Hudson Street, the Defendant Officers stopped their vehicle after purporting to observe a narcotics transaction. (Ds' SUMF ¶ 4.)  The Defendant Officers placed Rome Perry under arrest and charged him with possession of crack cocaine.  (*Id.* ¶ 7.)  The Defendant Officers also placed Javier Morales (Plaintiff's brother) under arrest.  (*Id.* ¶¶ 6, 8; Maxwell Dep. at 83:19-21; "Reyes Video", ECF No. 87-3 Ex. 1 at 2:33-3:15.))[3]  Plaintiff began to film the interaction.  (Maxwell Dep. at 27:16-23, 81:8-11.)

---

[2] Defendants' ECF No. 85-7 Ex. I is referenced in their SUMF (*see* Ds' SUMF ¶ 38) but was not submitted with the original briefings. Based on Defendants' supplemental submissions, Ex. I appears to be an additional copy of Officer Maxwell's deposition transcript and therefore is not referenced separately in this Opinion.
[3] According to the Defendant Officers, the arrest of Javier Morales and resulting charges against him for crack cocaine possession and distribution were never resolved, as Javier Morales was murdered on May 2, 2019, roughly two weeks after the arrest and nearby where it occurred.  (Ds' SUMF at ¶ 8 n.3; Maxwell Dep. at 48:24–49:1, 51:1-7.)

1.     <u>Videos of Plaintiff's Prior Altercations with Police Officers and Others</u>

Aside from the events related to the April 18, 2019 arrest of Javier Morales, Plaintiff had previously filmed Trenton police officers executing arrests on earlier occasions and posted them on his YouTube channel and social media accounts.  (Morales Dep. at 33:13–37:25; 86:1-7.)[4] Earlier that same day, while driving, Plaintiff saw an officer searching a teenager on the street. (*Id.* at 36:2–37:25.)  Plaintiff stopped his car and began filming while yelling and cursing at the officer, unaware that the teenager was a suspect in the stabbing of another teenager.  (*Id.*)  The officer told Plaintiff to "drive on" and said that he would arrest Plaintiff for obstruction, but Plaintiff instead responded with a reference to his genitals and yelled "fuck you" to the officer. (*Id.* at 36:21-25, 89:25–91:21; Maxwell Dep. at 13:3–14:21; Ds' SUMF ¶¶ 34–36.)[5]  Also on April 18, 2019, in another video Plaintiff posted on his YouTube channel, Plaintiff can be heard telling an officer to do something with his genitals, calling the officer a homosexual slur, and saying that "me and this p***y ass cop are going to fight", and that Plaintiff would "fuck this n**** up one day."  (ECF No. 85-7 Ex. H at 1:50–2:14; Morales Dep. at 87:20–88:19; Ds' SUMF ¶ 37.)  In the same video, Plaintiff can be heard refusing to put his hands behind his back after being ordered to do so several times by a police officer.  (ECF No. 85-7 Ex. H at 00:40–00:54.)  Plaintiff acknowledges that he resisted arrest in that instance.  (Morales Dep. at 86:5–87:3.)  In another video posted on his Facebook page, Plaintiff can be seen fighting another man, in his words "to make an example out of him."  (Morales Dep. at 95:16–96:10.)  Plaintiff was also filmed in February 2019 fighting a homeless man who had asked him for money, even though the man asked

---

[4] In the Amended Complaint, Plaintiff alleges that officers in the TPD sent an internal memo warning that Plaintiff might film them.  (Am Compl. ¶ 49.)  Plaintiff alleges that he learned of the internal memo from Officer Samuel Santiago of the Trenton City Police Department.  (*Id.* ¶ 50.)
[5] The Court has not received a copy of Defendants' ECF No. 85-7 Ex. G, which purports to be a video of this incident between Plaintiff and the officer regarding the search of a teenager on the street.  However, because the deposition transcripts include descriptions of the contents of Exhibit G and Plaintiff acknowledges the incident occurred (*see* Morales Dep. at 34:23–36:25), the Court relies on the descriptions of the incident in the deposition transcripts.

Plaintiff to "leave him alone" and did not appear to be fighting back. (Morales Dep. at 97:22–98:12.) Officer Maxwell testified he was aware at the time of Plaintiff's arrest that Plaintiff had threatened an officer earlier in the day on April 18, 2019, and that Officer Maxwell had seen additional videos Plaintiff posted of his altercations with police officers and other individuals. (Maxwell Dep. at 12:9–15:15; Ds' SUMF ¶ 38.)

        2.      <u>Events Leading Up to Plaintiff's April 18, 2019 Arrest</u>

On April 18, 2019, at approximately 10:30 P.M., Plaintiff and at least two other individuals, a man and a woman, were in front of 214-216 Pearl Street and observed the arrest of Javier Morales taking place across the street. (Maxwell Dep. at 27:9-14, 81:8-11; Morales Dep. at 45:20–47-5; Ds' SUMF ¶ 10.) Plaintiff alleges that he was on the porch of 214 Pearl Street when he observed his brother Javier Morales come around the corner and speak to a woman on the street, just as the police arrived. (Morales Dep. at 46:3–47-5.)[6] At the time, Plaintiff's mother-in-law owned 214 Pearl Street and his father lived there. (Morales Dep. at 41:3-7.)

Plaintiff began to film with his phone the interaction between Officers Maxwell, Bender, Ramos, and Javier Morales. (Maxwell Dep. at 27:16-23, 81:8-11.) Louis Reyes ("Reyes"), standing in close proximity to Plaintiff, also began filming the interaction with his phone. (Maxwell Dep. at 28:3-9; "Reyes Dep.", ECF No. 88-1 Ex. 6 at 9:6-13, 81:8-11.) Reyes testified he and the other observers were about 50 to 100 feet away from the arresting officers at the time. (Reyes Dep. at 61:4-7.) Officer Maxwell later wrote in a report that he "immediately" recognized Plaintiff as Juan Morales, who he knew had been convicted of felonies including drug crimes and resisting arrest, and violent crimes including aggravated assault, and had "recorded himself making

---

[6] Plaintiff disputes that the bystanders to the incident constituted a "group" or "crowd" of people, but does not recall how many people observed the incident. (P's Response to Ds' SUMF ¶ 17 (citing Maxwell Rep. at 14); *see also* Morales Dep. at 60:5-12.)

several physical threats towards law enforcement officers in the past and posted them on social media." (Maxwell Rep. at 13; Maxwell Dep. at 12:9–15:15, 16:2-6; Morales Dep. at 57:7-14; "Trial Tr.", ECF No. 85-5 Ex. D at 78:14-25; Ds' SUMF ¶ 19.)

Reyes crossed into the middle of the street to continue recording Officer Maxwell. (Reyes Dep. at 10:12-22.) At that point, Officer Maxwell turned around and, appearing to speak directly to Reyes, told him to "disappear, now." (Reyes Video at 00:14–00:35; Reyes Dep. at 10:21–11:16; Maxwell Dep. at 36:9-12.) Officer Maxwell states he was at minimum addressing Reyes, but that he is unsure, and that he was likely speaking generally to the bystanders as a whole. (Maxwell Dep. at 32:1-2, 36:13-22.) A male voice responded that the observers "don't got to disappear"; Reyes believes it was himself speaking in the video. (Reyes Video at 00:15; Reyes Dep. at 11:20–12:1.) Reyes testified that Plaintiff was at least 25 feet away from him at this moment. (Reyes Dep. at 10:12-21.) Officer Maxwell directed Reyes and the other bystanders to "Go stand over there, now," pointing to the area on the other side of a parked car in the street that was farther away from the officers. (Reyes Video at 00:17–00:35; Reyes Dep. at 11:3-6; Maxwell Dep. at 33:19-24.) Officer Maxwell testified that the observers initially complied with his instructions. (Maxwell Dep. 33-19–34-3.) At this point, at least two other people who appeared to be women, were observing the scene. (Reyes Video at 00:46; Morales Dep. at 68:17–69:6.)

After a male voice inquired "Is it illegal?" Officer Maxwell responded "You not listening is illegal." (Reyes Video at 00:20–00:22; Reyes Dep. at 11:3-9; Maxwell Dep. at 32:8-9.) Officer Maxwell is unsure who he was addressing, but believes he was addressing the observers as a whole. (Maxwell Dep. at 32:8-33:18.) At this point, Plaintiff testified that he and the other bystanders— except Reyes, who had moved back into the street—were across the street on the sidewalk "behind the [O]fficers" about 50 to 100 feet away from the Officers. (Morales Dep. at 61:4-16.) Officer

Maxwell pointed to an area that was further from where the group was standing and stated "You can videotape over there." (Reyes Video at 00:25–00:26; Ds' SUMF ¶ 21.) Plaintiff responded "I live right here" and "I ain't bothering nobody." (Reyes Video at 00:24–00:30; Morales Dep. at 67:10-17.)

As Officer Maxwell returned to the area where the Officers had detained Javier Morales and Rome Perry, Reyes said "he ain't do nothing." (Reyes Video at 00:46; Reyes Dep. at 13:12-13.) At this point, Plaintiff shouted to Javier Morales, "What they bagging you for?" (Reyes Video at 1:21; Reyes Dep. at 15:2-6.) Reyes also asked "You got evidence of that?" (Reyes Video at 1:42–1:44) and said "You need a witness for that." (Reyes Dep. at 16:8-12; Reyes Video at 1:48–1:49.) The bystanders including Reyes continued to engage in dialogue with Officer Maxwell, saying that he needed evidence and proof to arrest Javier Morales. (Reyes Dep. at 17:3-16.) Officer Maxwell returned to the bystanders and told them "We're not going to stand out here and debate with you, you understand? If you obstruct the investigation one more time, you're going to jail. . . . You've been warned. You've been warned." (Reyes Video at 2:12–2:19; Reyes Dep. at 18:1-4, 24:3-4; Maxwell Dep. at 97:6–98:8.) The parties dispute to whom Officer Maxwell was speaking at this time; Plaintiff believes Officer Maxwell was speaking directly to Reyes (P's Response to Ds' SUMF ¶¶ 22, 25) but Officer Maxwell believes he was speaking to the bystanders as a whole. (Ds' SUMF ¶¶ 22, 25.) Despite his warnings, Officer Maxwell did not arrest Reyes at any point during the interaction. (Reyes Dep. at 24:5-7; Maxwell Dep. at 114:15-116:13; Reyes Video at 3:28.)

Officer Maxwell alleges that his use of the term obstruct meant "by coming from where I told them that they couldn't come. . . . I moved them, initially where I moved them to, as a safety issue." (Maxwell Dep. at 50:13-25.) Officer Maxwell explained that "Juan Morales has threatened

to knock out Trenton police officers. That is a high crime area. His brother was murdered in that exact area, like, within feet of this incident. So I felt extremely unsafe for me and my officers, and I advised [the bystanders] where they could video from. They kept coming back" closer. (Maxwell Dep. at 48:24–49:1, 51:1-7.) Officer Maxwell is unsure, even after watching video footage of the incident, whether any of the bystanders came back onto the street. (Maxwell Dep. at 50:4-11.) Officer Maxwell further explained that the bystanders were "obstructing by not complying with my lawful command . . . because it was an officer safety issue." (Maxwell Dep. at 51:8-10.)

As other officers led Javier Morales toward a police car, Officer Maxwell picked up a sandwich bag appearing to contain a white substance from the ground from under the car at which the officers had searched Javier Morales. ("Morales Video", ECF No. 85-7 Ex. J at 3:00–3:02; Maxwell Dep. at 83:10-11; Morales Dep. at 73:23–74:7.) In the video, somebody can be heard saying "hell no" and later "fuck." (Reyes Video at 3:00–3:11; Maxwell Dep. at 25:6-24.) Officer Maxwell testified he did not at that point believe that the cursing rose to the level of a "tirade." (Maxwell Dep. at 26:6-10.) Officer Maxwell also testified that a "group" of people had begun to congregate at the scene, so that all in all the bystanders included at least Plaintiff, Reyes, a woman, and a "couple" of other people. (Maxwell Dep. at 27:9-14.)

Plaintiff shouted that the officers could not "pin" the bag on Javier given that, according to Plaintiff, the bag was not on the ground prior to Javier's arrest. (Morales Dep. at 50:23–51:1; Reyes Video at 2:59; Morales Video at 3:13–3:28.) Officer Maxwell responded: "You just videoed it. . . . You watched me go over and pick it up off the ground." (Maxwell Dep. at 60:2-14; Morales Video at 3:18–3:22.)[7] At this time, the onlookers began cursing and yelling at the officers; the yelling consisted primarily of statements about police brutality, harassment, and obscene language,

---

[7] Defendants' ECF No. 85-4 Ex. C appears to be the Morales Video, so the Court will not refer to Ex. C separately in this Opinion.

as well as questioning the validity of the arrest.  (Morales Video at 3:13–3:36; Reyes Video at 3:05–3:22; Maxwell Dep. at 83:10-11; Ds' SUMF ¶ 11.)  Reyes told Officer Maxwell "you didn't take it off him," presumably referring to the drugs allegedly found near Javier Morales.  (Reyes Dep. at 19:21–20:5; Reyes Video at 3:08–09; P's Additional SUMF ¶ 28.)  At the same time, Plaintiff was cursing at Officer Maxwell.  (Reyes Dep. at 24:16-23.)  Plaintiff can be heard referring to Officer Maxwell as "bitch."  (Morales Video at 3:27; Maxwell Dep. at 62:12-14.)

Officer Maxwell walked directly past Reyes, who was not standing where Officer Maxwell had told him to, in order to get to Plaintiff.  (Reyes Video at 3:16–3:18; 3:28–3:43; Reyes Dep. at 21:11-16, 24:10-12.)  Plaintiff told Officer Maxwell "Get the fuck away from me, bro."  (Reyes Video at 3:16; Morales Video at 3:31–3:34; Maxwell Dep. at 62:6-14; Morales Dep at 59:8-15.)  As Officer Maxwell approached Plaintiff, Officer Maxwell said "I don't know who you're used to talking to, but I ain't those people."  (Morales Video at 3:30–3:34; Maxwell Dep. at 61:23-25;)  Officer Maxwell testified that he took offense to Plaintiff's "screaming" and "total behavior."  (Maxwell Dep. at 62:3-5.)  He stated that he said those words to Plaintiff because Plaintiff "has made it a point to interfere and obstruct in other investigations and other officers allow him to dictate the scene.  Let him act improper.  I wasn't going to let him do that."  (Maxwell Dep. at 63:8-13.)  In addition, Officer Maxwell testified that he was responding to Plaintiff's "behavior, the cursing.  It's late at night.  It's a residential area.  Like, you can't be acting improper. . . . You can see me explain to him that he's obstructing and acting improper."  (Maxwell Dep. at 63:16-21.)  Officer Maxwell clarified that "acting improper" referred to Plaintiff's "cursing and swearing" at "ten o'clock at night in a residential area" (Maxwell Dep. at 63:22-25) and "acting tumultuous," which he defined as "screaming.  Raising your voice. . . . rambunctious . . . loud for no legitimate reason."  (Maxwell Dep. at 65:16-23.)

Officer Maxwell told Plaintiff: "You're going to go stand over there like I told you." (Morales Video at 3:36; Reyes Video at 3:20; Reyes Dep. at 25:10-26:1.)  Officer Maxwell testified that "I told [Plaintiff] to move back and . . . he moved back and then proceeded to come closer again." (Maxwell Dep. at 34:16-19.)  At this time, there were at least three people—other than Plaintiff and Reyes—on the sidewalk across the street from the Officers; Officer Maxwell does not recall two of them being there when the incident started.  (Reyes Video at 3:29; Maxwell Dep. at 66:1-15.)  Plaintiff objected to Officer Maxwell's order, stating that he was standing on his own property—which was, in reality, the front porch of his mother-in-law's home.  (Morales Video at 3:38–3:42.)  Officer Maxwell responded to Plaintiff "I don't give a shit.  I'll come right up there and lock you up."  (Reyes Video at 3:29–3:32; Morales Video at 3:45–3:48; Maxwell Dep. at 64:19-20.)  Officer Maxwell testified he used this language because "I was using the same language he was using, to let him know I was serious and that—it's constructive force . . . I wasn't going to back down, . . . he wasn't going to dictate the situation, and just because he went up on the porch doesn't mean that I can't place him under arrest."  (Maxwell Dep. at 64:19-65:13; *see also* Reyes Video at 3:20-3:35.)

When Plaintiff asked Officer Maxwell the basis upon which he would arrest Plaintiff, Officer Maxwell responded: "For acting improper."  (Morales Video at 3:49; Morales Dep. at 59:8-15.)  Plaintiff responded that he was "not acting improper" but was rather "just recording." (Morales Video at 3:49–3:52; Morales Dep. at 59:14-15.)  Officer Maxwell then walked away and told Plaintiff, "You can record all you want."  (Morales Video at 3:55.)  At this point, three observers can be seen in the video—one on the porch and two more a few feet away down the street; they did not approach Officer Maxwell.  (Reyes Video at 3:31; Maxwell Dep. at 69:16-23.) Officer Maxwell testified that he was "worried about our [the officers'] safety in that area and

doing the investigation, but not to the point where I would pull my weapon out." (Maxwell Dep. at 70:15-17.)

Some of the other comments made by Plaintiff while the officers were arresting his brother include: "The fuck they doing," (Morales Dep. at 66:14-16); "I live right here so it don't matter," when Officer Maxwell ordered him to videotape in a different location (*id.* at 67:21-68:8; Morales Video at 00:42); "What they got you for?" (Morales Dep. at 69:16-19; Reyes Video at 1:03); "What the fuck was that, asshole?" (Morales Dep. at 70:2-5; Morales Video at 1:10); "You need a witness for that," (Morales Dep. at 72:5-10; Reyes Video at 2:10); "Possession is nine tenths of the law," (Morales Dep. at 73:5-7; Morales Video at 2:18); and "What the fuck was that?" before proceeding to argue with Officer Maxwell about whether the Officers could arrest his brother for the white substance found where he had been standing. (Ds' SUMF ¶ 52; Morales Video at 3:05–3:25; Morales Dep. at 73:23-73:19.)

As Officer Maxwell walked away past Reyes again (Reyes Video at 3:36-3:43; Reyes Dep. at 26:5-20, 15:9–18:10), toward his vehicle with his back to Plaintiff, Plaintiff, who was still on the porch, shouted: "I'm going to take [the recording] to my lawyer's office tomorrow." (Reyes Video at 3:41–3:44; Maxwell Dep. at 70:18–21, 71:15-23; Morales Dep. at 51:2-9.) Officer Maxwell turned, facing Plaintiff, and said "take it wherever you want." (Morales Video at 3:43–3:44; Maxwell Dep. at 71:4-5, 71:24–72:3.) At the top of his voice, Plaintiff yelled "fuck you" to Officer Maxwell. (Reyes Video at 3:45; Morales Video at 4:00; Maxwell Dep. at 73:6-7; Morales Dep. at 51:2-9, 59:8-19.) Officer Maxwell testified that "[e]verybody on the block heard [Plaintiff] say [fuck you] because that's how loud he screamed it." (Maxwell Dep. at 73:6-8.) Officer Maxwell responded "what you say?" (Maxwell Dep. at 73:9-10; Reyes Video at 3:46; Morales

Video at 4:01.)  Officer Maxwell turned and "began walking purposefully toward" Plaintiff.  (Ds' SUMF ¶ 45; Reyes Video at 3:47; Morales Video at 4:02.)

### 3. Plaintiff's Arrest

"When [Officer Maxwell] turned, [Plaintiff]" started backing away "at an accelerated pace" toward Benton Street, and then "took off running," and Officer Maxwell and Officer Bender "went running after [Plaintiff]."  (Ds' SUMF ¶¶ 28, 45; Maxwell Dep. at 73:13-15; Maxwell Rep. at 13; Morales Dep. at 51:6-9; Trial Tr. at 34:1-17; Reyes Video at 3:47.)  The parties dispute who began running first; Plaintiff testified that it was Officer Maxwell who "charge[d] toward [him]" (Morales Dep. at 51:6-9), while Officer Maxwell maintains that Plaintiff began running before the Officers ran after him.  (Maxwell Rep. at 13.)

Officer Maxwell testified that he and Officer Bender ran after Plaintiff to place him under arrest because of Plaintiff's behavior, and "because he screamed 'fuck you' and acted improper, right after he was told that he was acting improper and to stop."  (Maxwell Dep. at 73:13-15, 110:13-16.)  However, Officer Maxwell testified that it was not the specific words "fuck you" that led to Plaintiff's arrest; rather, it was his manner of "screaming," "acting improper" and "disrupting that neighborhood" in a residential area "after he's been warned multiple times about acting improper and if he continued the behavior" he would be arrested.  (Maxwell Dep. at 74:3–75:19, 76:24–77:18.)  In fact, Officer Maxwell testified that Plaintiff could have screamed any other words in the same way, and he would still have been arrested.  (Maxwell Dep. at 75:4-19.)

At the moment Plaintiff screamed "fuck you," the Officers considered Plaintiff to be under arrest.  (Maxwell Dep. at 73:13-23; Morales Dep. at 51:2-9.)  However, the Officers did not tell Plaintiff he was under arrest or yell at him to "stop" until they later apprehended Plaintiff. (Maxwell Dep. at 73:13-23; Morales Dep. at 51:2-9, 56:2-5.)  Officer Maxwell testified that Plaintiff "knew he was going to be placed under arrest because a reasonable person" would

understand that "screaming," "acting improper" and "disrupting that neighborhood" in a residential area "after he's been warned multiple times about acting improper" would subject that individual to arrest.  (Maxwell Dep. at 74:3–75:19, 76:24–77:18.)  Officer Maxwell also testified that he believed Plaintiff was "trying to incite the rest of the people that were out there.  It was him trying to obstruct the investigation further."  (Maxwell Dep. at 76:9-12; Ds' SUMF ¶¶ 23, 25.)

As Plaintiff began to run on Pearl Street towards Benton Street, Officer Maxwell and Officer Bender pursued Plaintiff; Officer Bender caught up with Plaintiff first.  (Maxwell Dep. at 77:21–78:2; Maxwell Rep. at 13–14.)  Officer Bender dove and "tackle[d]" Plaintiff, "causing him to fall head first into a brick wall or the pavement on Benton Street.  (Ds' SUMF ¶¶ 15, 46; Maxwell Rep. at 14; Morales Dep. at 53:11-23.)  As a result of his head hitting the pavement when he fell, Plaintiff sustained an abrasion on his face above his right eye on the side of his forehead.  (Ds' SUMF ¶ 47; Morales Dep. 53:19–54:15.)  Plaintiff fell face down with his hands at his sides.  (Maxwell Rep. at 14; Morales Dep. at 57:7-8.)  Officer Maxwell and Officer Bender "tr[ied] to get [Plaintiff] into handcuffs" and "shouted several times to [Plaintiff] to stop resisting and give [them] his hands."  (Ds' SUMF ¶¶ 15, 29, 49; Maxwell Rep. at 15.)  However, Officer Maxwell testified that Plaintiff was "fighting" with the Officers and "refused [their] commands to comply."  (Ds' SUMF ¶¶ 15, 29; Maxwell Rep. at 15.)  At some point during this interaction, the Defendant Officers informed Plaintiff he was under arrest and Plaintiff understood that he was being arrested.  (Maxwell Dep. at 73:20-23; Morales Dep. at 58:2-9.)  The Defendant Officers contend they "violently struggled" with Plaintiff, and Officer Bender was eventually able to get Plaintiff's right hand into handcuffs.  (Maxwell Rep. at 14.)  With Plaintiff "still struggling on the ground," Officer Maxwell contends he pinned Plaintiff down with his knees in order to try to try to get Plaintiff's left hand into handcuffs.  (*Id.*)  Plaintiff testified that he was complying with the officers' requests

to "stop resisting," because his hands were at his sides, but he could not put his hands behind his back because Officer Maxwell was "on my back" pinning him down. (Morales Dep. at 55:18-25, 56:5–57:4.) As Officer Maxwell pinned Morales face down with his knees, Officer Maxwell "delivered punches to the left side of his upper body attempting to stun him enough so [the Officers] could force [Plaintiff's] left hand into handcuffs"; at this point, Morales complied and the officers were able to handcuff him. (Ds' SUMF ¶ 49; Maxwell Rep. at 14; Morales Dep. at 56:5-9.) Plaintiff testified that neither of the Defendant Officers had tried to get his hands into handcuffs before Officer Maxwell began striking him, but they had told him to give them his hands and stop resisting. (Morales Dep. at 56:14-23.) Plaintiff also testified that Officer Maxwell hit Plaintiff several times on his head and back with his hands and a "hard object" which he believes to be a "walkie-talkie," prior to handcuffing him, while instructing him to stop resisting. (Ds' SUMF ¶ 49; Morales Dep. at 54:16-21, 55:18-56:9, 55:7-20.) Plaintiff testified "I don't know" whether the Defendant Officers had used excessive force in tackling him, but questioned why the Defendant Officers delivered punches once he was already on the ground. (Morales Dep. at 52:14-16.) Once the officers had handcuffed Plaintiff, Officer Maxwell ceased striking Plaintiff. (Ds' SUMF ¶ 51; Morales Dep. at 56:7-9.)

The Defendant Officers took Plaintiff into custody. (Maxwell Rep. at 14.) Plaintiff was transported back to Trenton Police Headquarters and processed, charged, issued a "hand summons" (also known as a "summon complaint") and "released pending a future court appearance." (Ds' SUMF ¶ 16; Maxwell Rep. at 14; Ramos Incident Report ("Ramos Rep."), ECF Nos. 85-4 Ex. A & 87-6 Ex. 4 at 9.)[8] The Officers charged Plaintiff with three offenses: Disorderly Conduct/Improper Behavior, N.J. Stat. 2C:33-2(a); Obstructing the Administration of the Law,

---

[8] For clarity, the Court uses ECF pagination when referring to Officer Ramos's Report.

N.J. Stat. 2C:29-1; and Resisting Arrest (Flight), N.J. Stat. 2C:29-2.[9]  (Ramos Rep. at 2, 6.)

Plaintiff was later taken to Helene Fuld Medical Center for treatment for "abrasions he suffered to

the right side of his face," but refused medical attention, allegedly because he did not trust the

police.  (Ds' SUMF ¶¶ 15, 60; Maxwell Rep. at 14; Ramos Rep. at 9, 13; Morales Dep. at 100:2-

4–101:20.)  Plaintiff testified he "had bruises on my face, scrapes on my face, back of my head,

everything," as well as injuries to his ear and back.  (Morales Dep. at 100:15-23.)  After his release

later that night or early the next morning, Plaintiff went to the same hospital to obtain treatment.

(Ds' SUMF ¶ 61; Morales Dep. at 102:13-20.)  The emergency room staff examined Plaintiff, but

concluded he did not require stitches, sutures, stapling, gluing, or bandages, and Plaintiff does not

recall whether the hospital offered any affirmative treatment for his injury at all.  (Ds' SUMF ¶ 62;

Morales Dep. at 102:24–103:21.)  After his second trip to the hospital, Plaintiff received no further

treatment for any injury allegedly sustained during or after his arrest, and he testified he has no

lasting injuries other than a scar on his face from the abrasion.  (Ds' SUMF ¶ 63; Morales Dep. at

103:22–20.)

### 4.     Plaintiff's Trial and Conviction on All Charges

On October 25, 2022, Plaintiff was tried in the Municipal Court for the City of Trenton

("Municipal Court"), which found Plaintiff guilty of all three charges against him.[10]  (Ds' SUMF

¶¶ 53, 55; *see generally* Trial Tr.; *see also* Moving Br. at 6.)[11]  Regarding the Disorderly

Conduct/Improper Behavior charge, the Municipal Court found:

---

[9] The Disorderly Conduct/Improper behavior charge, N.J. Stat. 2C:33-2(a), is a misdemeanor; the Resisting Arrest charge, N.J. Stat. 2C:29-2, was originally charged as a felony but later downgraded by the County Prosecutor's Office to a misdemeanor; and the Obstructing the Administration of the Law charge, N.J. Stat. 2C:29-1, is a felony.  (Trial Tr. at 73:22-25; Ramos Rep. at 4.)

[10] During that same hearing, Plaintiff left the court without permission and a warrant was issued for his arrest.  (Trial Tr. at 78:3–79:8.)

[11] The Court notes the preclusive effect of the Municipal Court's findings, which prevent the re-litigation of the issue of validity of Plaintiffs' arrest for the crimes for which he was convicted.  *See Migra v. Warren City School Dist. Ed. of Ed.*, 465 U.S. 75, 80 (1984) (clarifying that the *res judicata* effect of state court decisions in § 1983 actions is a

The charge of Improper Behavior is not a serious offense in terms of danger in most cases. Officers I think have gotten used to being cursed. Officers have gotten used to being cajoled in some way maybe called names they rather not be called, don't deserve to be called if they're in the course of their duties. *But at the same time, this action here by Mr. Morales exceeded that.*

If, in fact, this was a situation where there were ten officers on the scene, Mr. Morales probably was just an annoyance. *But in that location at that time of night with other persons being kind of called out to see what was going on by Mr. Morales' conduct, it did create a dangerous situation for the officers.*

The caselaw itself involves not just offensive language, it involves making—using language that either excited a crowd or involved threats that could be carried out. In this case, I don't believe Mr. Morales was issuing threats, but, *certainly, his conduct was such that it did as offensive language cause matters to be escalating in that way.*

(Trial Tr. at 72:16–73:4 (emphases added).)

As to the charge of Resisting Arrest, the Municipal Court held:

[T]he charge of resisting arrest by flight here is leading the officers on a foot chase. The burden of proof, obviously, always remains with the state in all these matters. . . .

But the question comes to this point, *did the individual endeavor to prevent his own arrest.* So here in this case, clearly Mr. Morales *knew by virtue of the fact that he had been warned that he was going to be placed under arrest by coming forward that third time and he took off* for that reason. *And, clearly, his running away was nothing more than resisting his arrest to occur as he knew it would be and, in fact, did continue that resisting arrest once he was on the ground by not simply offering his hands to the officer, so that he could be placed under arrest.* So I'm going to find Mr. Morales guilty of that second charge.

(*Id.* at 73:22–74:22 (emphases added).)

---

matter of state law); *see also Wheeler v. Nieves*, 762 F. Supp. 617, 623–27 (D.N.J. 1991) (noting that New Jersey law requires that any "subsequent action involve substantially similar or identical causes of action, issues, parties and relief as were involved in the prior action" in order for preclusion to apply, and holding that a prior criminal conviction in New Jersey involving the same parties and issues barred re-litigation in federal court of "issues which were essential to the verdict"). Moreover, Plaintiff did not appeal his convictions. (Ds' SUMF ¶ 59.)

Lastly, regarding the charge of Obstructing the Administration of the Law, the Municipal Court held:

> As to the obstruction of administration of law by refusing to comply with the law enforcement officer's commands during the course of a police investigation clearly as to the first part, this was a police investigation. It was ongoing. *Two individuals were being talked to by three officers at the scene.* And, again, in this case, we find Mr. Morales doing nothing to help the situation, instead, doing everything he could possibly do to interfere with that investigation that was going on. *He did it by his words, his actions in coming forward, and by his general conduct and not obeying the commands of the officer to simply stand back. He was given two chances to just stand back away.* I think there was reference from maybe about 50 feet. And, clearly, there would be no difficulty in an individual observing what was going on, recording what was going on at that point in time.
> *Mr. Morales in his active manner created the problem he finds himself in court here today.* And I am going to find him guilty of the objection [sic] of administration of law.

(*Id.* at 74:23–75:18 (emphases added).) Plaintiff did not appeal his convictions. (Ds' SUMF ¶ 59.)

## B.    PROCEDURAL HISTORY

On March 30, 2021, Plaintiff filed a complaint in this Court, naming the City of Trenton, Officer Maxwell, Officer Bender, and Officer Christopher Hutton ("Officer Hutton") as defendants. (ECF No. 1.) Plaintiff filed an Amended Complaint on April 15, 2021, naming as defendants only Officers Maxwell and Bender. (Am. Compl.) The Amended Complaint asserts the following causes of action, which Plaintiff brought under 42 U.S.C. § 1983 ("§ 1983"): Count One alleges that the Defendant Officers unlawfully arrested Plaintiff in retaliation against his exercise of the right to free speech protected by the First Amendment of the U.S. Constitution; Count Two alleges that the Defendant Officers violated the Equal Protection Clause of the Fourteenth Amendment by discriminating against Plaintiff for exercising his right to free speech; Count Three alleges that the Defendant Officers violated the Fourth Amendment by arresting Plaintiff without a warrant supported by probable cause; Count Four alleges that the Defendant

Officers violated the Fourth Amendment by using excessive force while arresting Plaintiff; and Count Five alleges that Officer Bender unlawfully failed to intervene when Officer Maxwell began punching Plaintiff during the arrest. (*Id.*) Plaintiff sues the Defendant Officers in their individual capacities, seeking monetary damages and attorneys' fees. (*Id.*)

On August 18, 2021, Defendants filed a motion to dismiss the Complaint pursuant to Federal Rule of Civil Procedure ("Rule") 12(c). (ECF No. 22.) However, on September 14, 2021, Defendants filed a motion to withdraw the motion to dismiss, (ECF No. 27), and on the same day Defendants timely filed their Answer to the Amended Complaint, (ECF No. 26), as well as a motion to dismiss the amended complaint pursuant to Rule 12(c). (ECF No. 28.) The Court denied Defendants' motion to dismiss as to Counts One, Two, Three, and Four, but granted the motion as to Count Five. ("Prior Op.", ECF No 35; *see also* ECF No. 36.) The Court provided Plaintiff with fourteen (14) days to amend Count Five (*id.*), but Plaintiff did not do so.

On February 28, 2024, Defendants filed the instant Motion for Summary Judgment as to remaining Counts One through Four. (ECF No. 85.) Plaintiff opposed (ECF No. 87) and Defendants replied (ECF No. 86).

## II.    **LEGAL STANDARD**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986), and it is material "if, under the substantive law, it would affect the outcome of the suit." *United Therapeutics Corp. v. Sandoz, Inc.*, Civ. Nos. 12-1617, 13-316, 2014 WL 1405044, at *1 (D.N.J. Apr. 10, 2014) (citing *Anderson*, 477 U.S. at 248). "The mere existence of a scintilla of evidence

. . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson*, 477 U.S. at 252. At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* at 255.

A movant for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Where a defendant moves for summary judgment based on a claim for which the plaintiff bears the burden of proof, the defendant need only point to the plaintiff's failure "to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case." *Celotex*, 477 U.S. at 322. Once the moving party has made this showing, the burden then shifts to the party opposing summary judgment to proffer "'specific facts showing there is a genuine issue for trial.'" *Id.* (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1) (providing that a party alleging a fact is genuinely disputed "must support the assertion by . . . citing to particular parts of materials in the record").

## III.    <u>DISCUSSION</u>

### A.    **NO GENUINE DISPUTE OF MATERIAL FACT**

As an initial matter, there is no genuine dispute of material fact in this case. In fact, the parties submitted as evidence several identical documents. The parties do dispute certain facts, such as exactly who was speaking at certain points in the videos of the April 18, 2019 incident (*see, e.g.*, Ds' SUMF ¶¶ 22, 25; P's Response to Ds' SUMF ¶¶ 22, 25), the exact number of bystanders to the incident on that day (P's Response to Ds' SUMF ¶ 17 (citing Maxwell Rep. at

14); Morales Dep. at 60:5-12), and whether Plaintiff or the Officers began running first during the course of Plaintiff's arrest. (Morales Dep. at 51:6-9; Maxwell Rep. at 13.) However, these disputes are neither genuine nor material to the resolution of this case. As discussed below, there is also no genuine dispute of material fact as to the circumstances underlying the Defendant Officers' probable cause analysis and qualified immunity eligibility. Therefore, the Court will rule on the issues as a matter of law.

### B. COUNTS ONE (§ 1983 FIRST AMENDMENT RETALIATORY ARREST), TWO (§ 1983 FOURTEENTH AMENDMENT EQUAL PROTECTION), AND THREE (§ 1983 FALSE ARREST)

Defendants move for summary judgment in their favor on each remaining Count in the Amended Complaint (Counts One through Four). They argue that Counts One, Two,[12] and Three should be dismissed because Defendants had probable cause to arrest Plaintiff. (*See* Moving Br. at 6–7, 10; "Reply Br.", ECF No. 86 at 2.) In addition, Defendants argue Plaintiff's claims are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994) because Plaintiff was convicted of all charges. (Moving Br. at 8-9; Reply Br. at 2; *See also generally* ECF No. 86-1.)[13] Defendants also argue they were entitled to qualified immunity when carrying out Plaintiff's arrest, and therefore they are protected from liability. (*See* Moving Br. at 12.) Plaintiff does not specifically challenge the existence of probable cause for his arrest. (*See* "Opp'n Br.", ECF No. 87 at 6.) However, Plaintiff contends that Defendants are not entitled to qualified immunity because the words Plaintiff used when communicating with Officers Maxwell and Bender were protected speech. (*Id*. at 12–15.) Basing his argument on a single case, *Nieves v. Bartlett*, 587 U.S. 391 (2019), Plaintiff contends

---

[12] Although they do not say so explicitly, Defendants imply—as they did in their motion to dismiss (ECF No. 28)—that the Court must grant summary judgment in their favor as to Plaintiff's Fourteenth Amendment equal protection claim in Count Two because it is premised on the First Amendment violation Plaintiff asserts in Count One. (*See* Moving Br. at 6–7; Prior Op. at 31.)

[13] Because Defendants' Moving Brief does not contain internal pagination, the Court uses ECF pagination when referring to their Moving Brief.

that the probable cause standard is inapplicable to his First Amendment Retaliation claim because *Nieves* created an exception to the requirement for a plaintiff to show lack of probable cause in order to succeed on a retaliatory arrest claim. (Opp'n Br. at 7.) Under *Nieves*, a plaintiff does not need to show lack of probable cause for his arrest if he can prove by "objective evidence" that, *but for* the protected speech at issue, he would not have been arrested. *See Nieves*, 587 U.S. at 407. Therefore, Plaintiff argues, he need only present (and has presented) "objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." (Opp'n Br. at 7 (quoting *Nieves*, 587 U.S. at 407).) Defendants respond that *Heck* and *Nieves* are distinct (Reply Br. at 2), and that Plaintiff has not shown that he and Reyes were similarly situated (*id.* at 2–5) because Plaintiff "represented a whole different level of threat than Mr. Reyes[.]" (*Id.* at 6.)

        1.     <u>42 U.S.C. § 1983 Standard</u>

The text of 42 U.S.C. § 1983 ("§ 1983") provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. To establish a claim under § 1983, a plaintiff must demonstrate that (1) the conduct deprived him of his rights, privileges, or immunities secured by the Constitution or laws of the United States and (2) the conduct challenged was committed by a person acting under color of state law. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980); *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 146 (3d Cir. 2005).

      2.    <u>Plaintiff Has Not Presented Evidence that the Officers Lacked Probable Cause for His Arrest</u>

To prevail on a claim for retaliatory arrest or false arrest under § 1983, a plaintiff must show that he was arrested without probable cause. *Nieves*, 587 U.S. at 405 (stating, in the context of a retaliatory arrest claim, that the plaintiff must "prove as a threshold matter that the decision to press charges was objectively unreasonable because it was not supported by probable cause" and that "[t]he presence of probable cause should generally defeat a First Amendment retaliatory arrest claim"); *Mikhaeil v. Santos*, 646 F. App'x 158, 162 (3d Cir. 2016) (same conclusion as to false arrest and imprisonment); *Groman*, 47 F.3d at 634 (same); *Williams v. City of York, Pa.*, 967 F.3d 252, 263 (3d Cir. 2020) (quoting *James v. City of Wilkes-Barre*, 700 F.3d 675, 680 (3d Cir. 2012) (same conclusion as to false arrest and excessive force). If, however, a plaintiff presents "evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been," the plaintiff need not show the absence of probable cause in order to prevail on a retaliatory arrest claim. *Nieves*, 587 U.S. at 407.

Plaintiff does not challenge the finding that probable cause existed for his arrest, nor did he argue this issue during his criminal trial. (*See generally* Trial Tr.) Instead, Plaintiff argues that he has presented evidence that another similarly situated individual was not arrested because on April 18, 2019, the Officers had probable cause to arrest Reyes, who was similarly situated to Plaintiff, but exercised their discretion not to do so. (Opp'n Br. at 7.) *See also Nieves*, 587 U.S. at 406. It is clear that during Reyes's interactions with the Officers, Reyes was standing in the street rather than in the location where Officer Maxwell had directed him to stand, and challenging the officers about whether they had evidence and proof to arrest Javier Morales and Rome Perry. (Reyes Dep. at 21:11-16, 24:10-12; Reyes Video at 1:37–2:30, 3:14–3:28.) However, Plaintiff and Reyes were not similarly situated. Unlike Plaintiff, there is no evidence that Reyes was cursing

at Officers, had a violent criminal record, or had threatened to physically attack any officers in the past. (Ds' SUMF ¶ 19; Maxwell Rep. at 13; Morales Dep. at 57:7-14.)[14]

Moreover, Plaintiff was much more disruptive and vocal than Reyes. He repeatedly refused to comply with directives from the officers to stand in a certain location (*see, e.g.*, Maxwell Dep. at 34:16-19; Morales Video at 3:36; Reyes Video at 3:20; Reyes Dep. at 25:10-26:1); impeded the officers' ability to safely carry out the arrests after being warned he would be arrested if he continued his behavior (Reyes Video at 2:12–2:19; Reyes Dep. at 18:1-4, 24:3-4; Maxwell Dep. at 97:6–98:8); and berated officers with obscenities while they attempted to arrest his brother and Rome Perry, including referring to Officer Maxwell as "bitch," (Reyes Dep. at 24:16-23; Morales Video at 3:27; Maxwell Dep. at 62:12-14), saying "Get the fuck away from me, bro," and screaming "fuck you" loudly enough to incite the other bystanders. (Reyes Video at 3:16, 3:45; Morales Video at 3:31–3:34, 4:00; Maxwell Dep. at 62:6-14, 73:6-7, 76:9-12; Morales Dep at 51:2-9, 59:8-15.) Although Reyes at certain points during the interaction did not stand where the officers told him to (Reyes Video at 3:16–3:18; 3:28–3:43; Reyes Dep. at 21:11-16, 24:10-12; Morales Dep. at 61:4-16) and questioned the officers' authority to arrest Javier Morales and Rome Perry (Reyes Video at 00:15, 1:48–1:49; Reyes Dep. at 11:20–12:1, 16:8-12), his behavior did not escalate to the level of Plaintiff's cursing and overall interference with an ongoing investigation.

---

[14] Plaintiff's supplemental authority, *Gonzalez v. Trevino*, 602 U.S. 653 (2024), is distinct from the present case (*See* ECF No. 90.) In that case, Gonzalez presented evidence that the Texas anti-tampering statute pursuant to which she was arrested and charged had never been used in the county to criminally charge someone for the conduct of which she was accused. (*Gonzalez*, 602 U.S at 657.) The Supreme Court explained that the evidence Gonzalez presented was acceptable in lieu of showing no probable cause because "the fact that no one has ever been arrested for engaging in a certain kind of conduct—especially when the criminal prohibition is longstanding and the conduct at issue is not novel—makes it more likely that an officer *has* declined to arrest someone for engaging in such conduct in the past." (*Id.* at 658.) Not only has Plaintiff failed to show that similarly situated individuals were not arrested, but Plaintiff also certainly cannot show that *nobody* was ever arrested for the crimes for which he was convicted. Therefore, *Gonzalez* has limited relevance to the present case.

The threat posed by Plaintiff was, based on the reasonably trustworthy information available to the officers, far greater than that posed by Reyes. Furthermore, for the reasons stated below, Plaintiff's claims in Counts One, Two, and Three, are barred by *Heck v. Humphrey*.

       3.    *Heck v. Humphrey* Bars Plaintiff's § 1983 Claims, Count One (Retaliatory Arrest, Count Two (Fourteenth Amendment Equal Protection), and Count Three (False Arrest)

Defendants contend that the Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477 (1994), bars all of Plaintiff's § 1983 claims as to Count One, Two, and Three. (Moving Br. at 8–9; Reply Br. at 2; *see also generally* ECF No. 86-1.) The Court agrees.

In *Heck v. Humphrey*, 512 U.S. 477 (1994), the Supreme Court held that a plaintiff subject to a still-valid conviction may not bring Section 1983 claims seeking monetary damages for an "unconstitutional conviction or imprisonment" or for "actions whose unlawfulness would render [his] conviction or sentence invalid." *Heck*, 512 U.S. at 486; *see also Calabrese v. Tierney*, Civ. No. 19-12526, 2020 WL 1485944, at *8 (D.N.J. Mar. 27, 2020). The Supreme Court analogized to a common-law claim for malicious prosecution, holding that to obtain relief under Section 1983, such a plaintiff must prove that the criminal proceeding his claim would impugn "terminat[ed] . . . in favor of the accused." *Heck*, 512 U.S. at 484. Specifically, the plaintiff must prove that his conviction has been reversed, expunged, or declared invalid before he can recover damages under Section 1983. *Id.* at 486–87.

The existence of a valid conviction, however, does not necessarily preclude all Section 1983 claims. District courts must undertake a fact-intensive inquiry for each claim raised by the plaintiff and determine whether each claim, if successful, would necessarily impugn the integrity of the plaintiff's criminal conviction. *See Gibson v. Superintendent, N.J. Dep't of Law & Pub. Safety,* 411 F.3d 427, 450 (3d Cir. 2005), *overruled on other grounds by Dique v. New Jersey State*

*Police,* 603 F.3d 181, 188 (3d Cir. 2010); *see also Brown v. Chardo*, Civ. No. 11–0638, 2012 WL 983553, at *7 (M.D. Pa. Mar. 22, 2012) ("[T]o determine whether the bar applies, the district court must determine whether a judgment for the plaintiff in the Section 1983 action would necessarily imply the invalidity of the plaintiff's conviction or sentence."); *Wallace v. Kato*, 549 U.S. 384, 393–94 (2007) ("If the plaintiff is ultimately convicted, and if the . . . civil suit would impugn that conviction, *Heck* will require dismissal; otherwise, the civil action will proceed, absent some other bar to suit.")

*Heck* bars Plaintiff's claims in Counts One, Two, and Three. In *Heck,* the Supreme Court observed that its substantive bar *would* preclude a Fourth Amendment claim for unreasonable seizure brought by a state inmate convicted of resisting arrest because, to prevail on that claim, "he would have to negate an element of the offense of which he had been convicted." *Heck*, 512 U.S. at 486–87 n.6; *see also Clouser v. Johnson*, 40 F. Supp. 3d. 425, 433–34 (M.D. Pa. 2014). As such, *Heck* bars Plaintiff's challenge to his conviction for resisting arrest, N.J. Stat. 2C:29-2.

The Court finds that *Heck* also applies to bar Counts One, Two, and Three as to Plaintiff's convictions for Disorderly Conduct/Improper Behavior, N.J. Stat. 2C:33-2(a), and Obstruction of the Administration of the Law, N.J. Stat. 2C:29-1. The Third Circuit has noted that because "a conviction and sentence may be upheld even in the absence of probable cause for the initial stop and arrest," a claim of unlawful arrest does not necessarily implicate the validity of a criminal prosecution subsequent to the arrest. *Montgomery v. De Simone*, 159 F.3d 120, 126 n.5 (3d Cir. 1998). This is because "there may be situations where probable cause for the original arrest was lacking, but subsequent evidence comes to light to convict beyond a reasonable doubt." *Williams v. Northfield*, Civ. No. 09–6192, 2011 WL 6140733 (D.N.J. Dec. 9, 2011) (citing *Burke v. Twp. of Cheltenham*, 742 F. Supp. 2d. 660, 669 (E.D. Pa. 2010) (alteration omitted)). "This could occur if

24

the arresting officers were not privy to all the information that *later* supported conviction." *Burke*, 742 F. Supp. 2d at 669 (emphasis in original) (holding that *Heck* barred a plaintiff's false arrest claim because at the time of the arrest, the officers had access to all the information forming the basis for the plaintiff's disorderly conduct charge and the plaintiff pled guilty to the disorderly conduct charge).

Here, the Defendant Officers had access to all the information forming the basis for Plaintiff's convictions on all three charges because they had observed his conduct firsthand and carried out his arrest themselves. Thus, finding in Plaintiff's favor on any of his three counts would require finding that the Defendant Officers lacked probable cause to arrest him, thereby invalidating his conviction and sentence. *Heck* therefore forecloses Plaintiff's claims for retaliatory arrest and false arrest, and his Fourteenth Amendment claim.

Accordingly, summary judgment will be **GRANTED** as to Counts One, Two, and Three.

### C.    COUNT FOUR: 42 USC § 1983 EXCESSIVE FORCE

Defendant Officers argue that the force they used during Plaintiff's arrest was objectively reasonable and therefore that they had qualified immunity when effectuating Plaintiff's arrest, insulating them from liability. (Moving Br. at 19–22; Reply Br. at 6–7.) Plaintiff challenges qualified immunity only to the extent that he argues his speech was protected by the First Amendment; he does not challenge qualified immunity as to Fourth Amendment search and seizure or use of excessive force. (Opp'n Br. at 12–15.) Plaintiff does not dispute that probable cause existed for his arrest and does not argue that a lack of probable cause defeats qualified immunity.

For the reasons stated below, the Court finds that the Defendant Officers' use of force was objectively reasonable,[15] and that the Defendant Officers had qualified immunity at the time they arrested Plaintiff, insulating them from liability.

The determination of "whether an officer made a reasonable mistake of law, and is thus entitled to qualified immunity, is a question of law that is properly answered by the court, not a jury," and a judge may "decide the objective reasonableness issue once all the historical facts are no longer in dispute." *Curley v. Klem,* 499 F.3d 199, 211 & n.12 (3d Cir. 2007).

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauley*, 580 U.S. 73, 78–79 (2017) (citation and internal quotation marks omitted). "[F]or a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 79. This is a two-part analysis: first, a court considering qualified immunity must decide "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right." *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 432 (D.N.J. 2011) (quoting *Montanez v. Thompson*, 603 F.3d 243, 250 (3d Cir. 2010)). "Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was clearly established at the time of a defendant's alleged misconduct." *Id.* The second prong involves an inquiry as to "'whether a reasonable officer could have believed that probable cause existed to arrest' the plaintiff." *Id.* at 439 (quoting *Ciardiello v. Sexton*, 390 F. App'x 193, 199 (3d Cir. 2010)).

---

[15] Because Plaintiff's excessive force claim focuses on the reasonableness of the officers' conduct during his arrest rather than the validity of his later convictions, Plaintiff's excessive force claim is not barred by *Heck*. *See, e.g.*, *Burke*, 742 F. Supp. 2d at 670–71 (holding that a plaintiff's excessive force claim was not barred by *Heck* because the plaintiff could "demonstrate liability [for excessive use of force] without impugning the validity of his later conviction for disorderly conduct").

"Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Id.* at 432.

Claims that an officer used excessive force in executing an arrest fall within the Fourth Amendment right to be free from unreasonable searches and seizures. *See Jefferson v. Lias*, 21 F.4th 74, 78 (3d Cir. 2021) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). "'To prevail on a Fourth Amendment excessive-force claim, a plaintiff must show that a seizure occurred and that it was unreasonable under the circumstances.'" *El v. City of Pittsburgh*, 975 F.3d 327, 336 (3d Cir. 2020) (quoting *Lamont v. New Jersey*, 637 F.3d 177, 182–83 (3d Cir. 2011)). Here, there is no question that Defendants seized Plaintiff by arresting him. *See, e.g.*, *Burke*, 742 F. Supp. 2d at 670 (finding a plaintiff's arrest equivalent to seizure). However, Plaintiff has not proven that, in doing so, Defendants carried out an *unlawful* seizure. In other words, Plaintiff has failed to present evidence that Defendants violated his Fourth Amendment rights.

### 1.    There Is No Evidence Defendants Violated Plaintiff's Fourth Amendment Rights

Viewing the evidence in the light most favorable to Plaintiff, no reasonable jury could find that Defendants violated Plaintiff's Fourth Amendment Rights when they arrested him. Rather, the evidence suggests that the Officers were objectively reasonable in arresting Plaintiff.

When Officers Maxwell, Bender, and Ramos arrived at the scene of the incident around 10:30pm on April 18, 2019, there were already at least three bystanders observing the scene on a public street—Plaintiff, Reyes, and a woman. (Maxwell Rep. at 13; Maxwell Dep. at 9:16-23, 27:9-14, 81:8-11; Morales Dep. at 45:20–47-5.) Officer Maxwell "immediately" recognized as one of the bystanders Plaintiff Juan Morales, who Officer Maxwell knew was a convicted felon with a violent criminal history and had previously recorded himself threatening officers with physical violence and posting the footage to a public audience on social media. (Ds' SUMF ¶¶ 19,

34–36; Maxwell Dep. at 12:9–15:15; Maxwell Rep. at 13; Morales Dep. at 36:21-25, 57:7-14, 89:25–91:21; ECF No. 85-7 Ex. H at 00:40–00:54, 1:50–2:14; Trial Tr. at 78:14-25.)  In fact, as Defendants state (Moving Br. at 20 n.6–8, 22 & n.10), Officer Maxwell testified he was aware that Plaintiff had threatened an officer with physical violence and resisted arrest that same day.  (Ds' SUMF ¶¶ 37–38; Morales Dep. at 86:5–87:3, 87:20–88:19; ECF No. 85-7 Ex. H at 00:40–00:54, 1:50–2:14.)  Therefore, Officer Maxwell was aware of the potential danger Plaintiff posed to the officers and bystanders, and his tendency to seek out an audience for his threats toward the police.

Although Plaintiff initially complied with Officer Maxwell's directions and did not make any physical threats to the officers in this instance (Maxwell Dep. 33-19–34-3), he later repeatedly disobeyed Officer Maxwell's requests to stay back and record "over there," making it more difficult for the officers to carry out the investigation.  (Reyes Video at 00:17–00:35, 3:20–3:21; Morales Dep. at 59:8-15; Reyes Dep. at 25:10-26:1; Maxwell Dep. at 34:16-19.)  Furthermore, he screamed obscenities at the top of his voice on a public residential street after 10:30 P.M.  (Reyes Video at 3:45; Morales Video at 4:00; Maxwell Dep. at 63:22-25, 73:6-8.)  Officer Maxwell testified that it was the manner in which Plaintiff "screamed" the words "fuck you," so that "[e]verybody on the block" could hear him in a residential area late at night after he had been instructed just a moment earlier to cease his behavior or be subjected to arrest, that led to his ultimate arrest for disorderly conduct.  (Maxwell Dep. at 73:6-8, 73:13-15, 74:3–75:19, 76:24–77:18, 110:13-16; Morales Dep. at 59:8-15.)  By this time, more bystanders had gathered at the scene, outnumbering the officers.  (Maxwell Dep. at 66:1-15; Reyes Video at 3:29.)  It was objectively reasonable for the officers to believe Plaintiff could incite the other bystanders and further escalate the situation, hindering the officers' attempts to arrest Javier Morales and Rome Perry.  (Maxwell Dep. at 76:9-12.)

Plaintiff had been warned, both indirectly with reference to Reyes and the bystanders as a whole (Reyes Video at 2:12–2:19; Reyes Dep. at 18:1-4, 24:3-4; Maxwell Dep. at 97:6–98:8), and directly a moment prior to his arrest, that he would be arrested if he continued his disruptive and obstructive behavior.  (Maxwell Dep. at 64:19-20; Reyes Dep. at 24:3-4; *see also* Reyes Video at 3:29-3:32.)  Therefore, at the time Officer Maxwell began walking toward Plaintiff after Plaintiff screamed "fuck you," Plaintiff would have been on notice that he was about to be arrested, but nevertheless chose to run rather than comply with the Officers.  (Ds' SUMF ¶¶ 28, 45; Maxwell Dep. at 73:13-15; Maxwell Rep. at 13; Morales Dep. at 51:6-9.)  As such, no reasonable jury could find that the Defendant Officers' subsequent arrest of Plaintiff was unreasonable.

The Municipal Court's decision is consistent with these findings.  Plaintiff interfered with the investigation "by his words, his actions in coming forward, and by his general conduct and not obeying the commands of the officer to simply stand back.  He was given two chances to just stand back away" but instead did "everything he could possibly do to interfere with that investigation[.]"  (Trial Tr. at 74:23–75:18.)  In addition, the Municipal Court noted that Plaintiff's yelling of obscenities "exceeded" the normal cursing and cajoling to which officers have become accustomed in the course of their duties.  (Trial Tr. at 72:16–73:4.)  The Municipal Court acknowledged that if there had been a greater number of officers at the scene, Plaintiff's behavior would have been "just an annoyance"; however, "in that location at that time of night with other [bystanders] being . . . called out to see what was going on by Mr. Morales' conduct, it did create a dangerous situation for the officers" with the potential to escalate the situation.  (Trial Tr. at 72:16–73:4.)  Furthermore, Plaintiff clearly "resisted arrest" by running from the scene.  (Trial Tr. at 73:22–74:22.)

Plaintiff has not shown that, based on the reasonably trustworthy information Officer Maxwell and Officer Bender had available on April 18, 2019, it was objectively unreasonable for

the Defendant Officers to arrest Plaintiff for the charged offenses.  (Maxwell Rep. at 13; Morales Dep. at 36:21-25, 57:7-14, 87:20–88:19, 89:25–91:21; ECF No. 85-7 Ex. H at 00:40–00:54, 1:50–2:14.)  The only remaining question is whether the force Defendants used to arrest Plaintiff was reasonable under the circumstances.  For the reasons below, the Court finds such force was reasonable.

### 2.    Reasonable Force

Although "[t]he reasonableness of the use of force is normally an issue for the jury," *Jefferson*, 21 F.4th at 79 (quoting *Rivas v. City of Passaic*, 365 F.3d 181, 198 (3d Cir. 2004)), in the absence of any disputed issues of material fact regarding whether the officers' views are reasonable, defendants are entitled to a judgment as a matter of law.  *Abraham v. Raso*, 183 F.3d 279, 290 (3d Cir. 1999) (citing *White v. Pierce County*, 797 F.2d 812, 816 (9th Cir.1986)).

Determining whether force was reasonable "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Graham*, 490 U.S. at 396.  Courts must determine "whether under the totality of the circumstances, 'the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations.'"  *Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2005) (quoting *Graham*, 490 U.S. at 397).  Relevant factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396.  Courts may also "assess the physical injury to the plaintiff, 'the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time.'"  *El*, 975 F.3d at 336 (quoting

*Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997), abrogated on other grounds by *Curley*, 499 F.3d at 209–11.  Although some courts have considered only the facts and circumstances at the precise moment that excessive force is applied, the Third Circuit has clarified that district courts must consider "all of the relevant facts and circumstances leading up to the time that the officers allegedly used excessive force." *See, e.g., Rivas v. City of Passaic*, 365 F.3d at 198; *Abraham*, 183 F.3d at 291.

### 3.    Plaintiff Cannot Show the Force Defendants Used to Arrest Him Was Unreasonable

The "severity" of the offenses for which Defendants arrested Plaintiff is "minimal."  *See, e.g.*, *Castellani v. City of Atlantic City*, Civ. No. 13-5848, 2017 WL 3112820, at *8 (D.N.J. July 21, 2017) (concluding that "disorderly conduct and public intoxication" are non-severe offenses under the *Graham* factors).  However, the totality of the circumstances, considering each *Graham* factor in turn, undermines Plaintiff's contention that the force Defendant Officers used was unreasonable.

Leading up to Plaintiff's arrest, it was reasonable for the officers to fear for their safety because although it is unclear whether Plaintiff ever crossed into the street like Reyes did, he ignored police orders to stay back and instead continued to move closer to record.  (Maxwell Dep. at 48:24–49:1, 51:1-7; Reyes Dep. at 25:10-26:1; Reyes Video at 3:11–3:30; Morales Video at 3:10–3:36.)  The officers were at minimum outnumbered by the bystanders who had congregated at the scene by the time the Defendant Officers arrested Plaintiff, making it more difficult for them to manage the investigation effectively while ensuring their own safety and the safety of the residents.  (Maxwell Dep. at 66:1-15; Reyes Video at 3:29.)  The officers were also aware of the potential danger Plaintiff posed to their safety because Officer Maxwell knew Plaintiff had been convicted of violent crimes and had threatened officers with physical violence in the past.

(Morales Dep. at 86:5–87:3, 87:20–88:19; Trial Tr. at 78:14-25).  In addition, the Defendant Officers' use of force took place in the context of an arrest complicated by Plaintiff fleeing the scene, thereby resisting his arrest.  (Ds' SUMF ¶¶ 28, 45; Maxwell Dep. at 73:13-15; Maxwell Rep. at 13; Morales Dep. at 51:6-9.)

Moreover, Plaintiff further resisted arrest once the Defendant Officers caught up to him, and despite their repeated requests to stop resisting, he kept his hands at his sides rather than allowing the Defendant Officers to handcuff him.  (Morales Dep. at 55:18-25, 56:5–57:4; Maxwell Rep. at 15.)  Although Plaintiff disputes that he resisted (Morales Dep. at 55:18-25, 56:5–57:4), the Municipal Court stated, at Plaintiff's criminal trial prior to finding him guilty of resisting arrest: "clearly, his running away was nothing more than resisting his arrest to occur as he knew it would be and, in fact, did continue that resisting arrest once he was on the ground by not simply offering his hands to the officer[.]"  (Trial Tr. at 73:22–74:22.)  Therefore, this Court finds Plaintiff's argument precluded by *res judicata*.  *See Migra*, 465 U.S. at 80; *Wheeler*, 762 F. Supp. at 623–27.

Plaintiff does not dispute that the Defendant Officers stopped striking him once they were able to put his hands into handcuffs, limiting their force to only that needed to effectuate the arrest. (Morales Dep. at 56:7-9.)  The severity of the injuries Plaintiff sustained during this arrest was limited.  Plaintiff had "bruises and scrapes" on various parts of his body, but there is no evidence that he was given any medical treatment, and he has no lasting injuries other than a scar on his face as a result of the incident.  (Maxwell Rep. at 14; Ramos Rep. at 9, 13; Morales Dep. at 100:2-4–101:20, 103:22–20.)  In sum, the totality of the circumstances indicate that the Defendant Officers' use of force was objectively reasonable in the context of attempting to subdue and arrest a resisting individual.  *See Kopec*, 361 F.3d at 776 (3d Cir. 2005); *Graham*, 490 U.S. at 397; *El*, 975 F.3d at 336.

Accordingly, summary judgment will also be **GRANTED** as to Count Four.

IV.    <u>**CONCLUSION**</u>

For the reasons stated above, the Court will **GRANT** Defendants' Motion (ECF No. 85).

An appropriate Order will follow.

Date: **November 1, 2024**

<u>s/ Zahid N. Quraishi</u>
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**